**FOURTH DIVISION**
**MERCIER, C. J.,**
**DILLARD, P. J., and LAND, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

June 11, 2025

# In the Court of Appeals of Georgia

A25A0128. GIBSON v. FOWLER.

DILLARD, Presiding Judge.

Hillary Fowler—the mother of then five-year-old twin boys—filed a petition for modification of child support, seeking an increase in the child-support obligations of the boys' father, Walter Gibson. Following an evidentiary hearing, the trial court significantly increased Gibson's child-support obligations. On appeal, Gibson contends the trial court erred by (1) increasing his child-support obligations by imputing an inflated income to him even though he submitted evidence of his actual earnings; (2) including extraordinary educational expenses despite the lack of any supporting evidence; adding non-work-related childcare expenses; and adding a high-income deviation based on imputed rather than adjusted income; and that as to educational and work-related childcare expenses, the trial court failed support its

calculations on the proper worksheets; and (3) by amending its order in a subsequent term of court to make the judgment temporary, rather than final, which required him to pay the new support award during the pendency of the appeal. For the following reasons, we vacate the trial court's ruling and remand this case for further proceedings consistent with this opinion.

Viewed in the light most favorable to the trial court's rulings,[1] the record shows that Fowler and Gibson are the unmarried parents of twin boys, W. G. and H. G., born in 2018. Shortly after the boys' birth, Fowler filed a petition to establish paternity and child support, and she and Gibson ultimately entered into a consent order and parenting plan, which the trial court approved on June 4, 2019. Under that plan, the parties shared legal custody, Fowler retained primary physical custody, and the court ordered Gibson to pay $1,584 per month in child support. But later that same month, Gibson moved to St. Louis, Missouri, for employment purposes.

In October 2020, both boys were diagnosed with speech-delay issues, and W. G. qualified for speech and occupational therapy services. About a year later, H. G.

---

[1] *See Cousin v. Tubbs*, 353 Ga. App. 873, 879 (3) (a) (840 SE2d 85) (2020) (explaining that following a bench trial, we review a trial court's ruling on a child-support modification petition for an abuse of discretion, and we will uphold the court's factual findings if they are supported by any evidence).

was also determined to need speech therapy. According to Fowler, efforts to have Gibson submit claims for the boys' therapy to his insurance were unsuccessful, and a later effort to submit such claims for reimbursement with her own insurance was similarly unsuccessful. As a result, Fowler paid for the speech therapy out of her own pocket.

On October 27, 2022, Fowler filed a petition to modify child support, claiming that Gibson's income had increased since the 2019 order. Gibson filed an answer, and in January 2024, the matter proceeded to an evidentiary hearing. During that hearing, Gibson testified that he began working at Equifax in a sales leadership position in July 2019 and earned a base salary of $275,000. Over the next two years, that base salary rose to $296,000, but under Equifax's aggressive commissions policy, Gibson increased his overall compensation above that base each year that he worked there. Indeed, his W-2s introduced at the hearing showed Gibson's gross income as follows: 2019 – $418,191; 2020 – $1,200,572; 2021 – $945,450; and 2022 – $330,000. With regard to the significant increase in income in 2020 and 2021, Gibson explained that one of the lines of business for which he was responsible was "Unemployment Claims Management," and when the COVID-19 pandemic struck, sales of these

unemployment-claims packages, unsurprisingly, rose considerably. Gibson noted that aside from those two years, he had "never made half that much," and he described the two-year spike as a "lightning-in-a-bottle scenario" and a "once-in-a-century type of a deal."

Gibson added that he left Equifax in February 2022 to work in a similar sales position for an education tech firm, for which he was paid a base salary of $300,000. But the move ended up being unsuccessful in light of the company's decreasing sales revenue. And as a result, the company laid him off in November 2022—around the same time Fowler filed her petition for modification—but paid him through the end of December of that year. Gibson's 2022 W-2—which was also introduced at the hearing—indicated a gross income of $330,000. Since the layoff, Gibson stated that he had applied for approximately 270 sales management jobs with the salary range of $150,000 to $200,000 (so as to be somewhat like his past salaries), but as of the hearing, he had not yet obtained permanent employment. Meanwhile, Gibson performed some temporary contract work, and he introduced evidence of those earnings, with his 2023 W-2 indicating a gross income of $230,510.

Finally, Gibson acknowledged that his assets included jewelry worth about $30,000, retirement accounts totaling approximately $1,200,000, and two vehicles were collectively valued at nearly $90,000. Gibson also added that he had been withdrawing money from his savings and some of his retirement accounts since becoming unemployed in order to meet his expenses and remain current on his child-support obligations for his two sons. And given his current circumstances, he requested the trial court grant a downward deviation to reflect his current unemployed status.

Fowler also testified during the hearing and explained that she currently works full-time and is employed as an au pair to care for the boys, who—as noted above—have speech challenges and require specialized schooling; and she currently spends approximately $2,000 per month for childcare. Fowler stated that tuition at the boys' then-current school was $1,995 per child per year, but that she planned to move them to a different school. As of the date of the hearing, she had not selected a new school for the boys, but she testified that she was strongly considering the Atlanta Speech School, which charges an annual tuition of $9,890 per child. Fowler added that she also looked at Woodward Academy, which would cost $33,000 per year per

child, but that, while she had not completely ruled it out, it was an unlikely option because its distance from her home would make the transportation logistics difficult.

After the hearing, on April 15, 2024, the trial court entered a final order, in which it imputed Gibson's gross annual income at $681,820. To arrive at that figure, the court did not consider Gibson's most recent W-2 (which showed an income of $230,510), but it looked at his 2019-2022 W-2s, discarded his highest yearly salary ($1,200,000) and lowest yearly salary ($330,000) from those years, and averaged the remaining two years. Based on this calculation, as well as a $2,000 high-income deviation, the trial court increased Gibson's monthly child-support obligation from $1,584 to $4,589 per month. In addition, expressing its frustration with Gibson's failure to exercise more frequent visitation, the trial court granted Fowler's request for additional work-related childcare costs in an amount up to but not to exceed $1,600 per month. And using the Woodward Academy tuition of $33,000 per year for each child as a template, the court awarded Fowler extraordinary educational expenses up to $3,575 per month. In sum, the trial court determined Gibson's total child-support obligation to be up to $9,764 per month. The trial court also concluded that, although he was currently unemployed, Gibson was capable of obtaining another high-

paying job comparable to his Equifax position and, until then, he could draw on his assets—including his savings and various retirement accounts—to meet his child-support obligations.

On April 19, 2024, the trial court amended its final order but only to incorporate the parenting plan the parties consented to before the hearing. A few days later, on April 24, 2024, Gibson filed a notice of intent to file a discretionary application seeking review of the final order. Three weeks later, Fowler filed a motion to correct a clerical omission and, in the alternative, a motion for supersedeas bond. Fowler requested the trial court amend its order to make the terms of the order a new temporary order and thereby enforceable pending appeal.[2] The trial court agreed, and on May 20, 2024, it entered an amended order providing that the new child-support award would "act as a temporary order, which shall bind the parties pending appeal of the final judgment." Gibson moved to vacate that order, but on July 5, 2024, we granted Gibson's application for a discretionary appeal; and so a few weeks later, the

---

[2] *See Franklin v. Franklin*, 294 Ga. 204, 207-08 (3) (751 SE2d 411) (2013) (explaining that by specifying a new temporary order would take effect in the event of an appeal, the trial court properly ensured that wife's obligation to pay child support would remain in force and effect even if wife challenged final decree).

trial court ruled that it now lacked jurisdiction to consider his motion. This appeal follows.

On appellate review of a bench trial, we will not set aside the trial court's factual findings "unless they are clearly erroneous, and we properly give due deference to the opportunity of the trial court to judge the credibility of the witnesses."[3] But importantly, the trial court's application of the law to the facts is "reviewed de novo."[4] With these guiding principles in mind, we turn to Gibson's specific claims of error.

1. Gibson contends the trial court erred in increasing his child-support obligations by imputing an inflated income to him even though he submitted evidence of his actual earnings. We agree.

Under Georgia law, determining each parent's monthly gross income is "the first step that a court must take in calculating child support under our child support

---

[3] *Cousin*, 353 Ga. App. at 874-75 (punctuation omitted); *accord Autrey v. Autrey*, 288 Ga. 283, 284-85 (2) (702 SE2d 878) (2010); *Jackson v. Sanders*, 333 Ga. App. 544, 548 (2) (773 SE2d 835) (2015).

[4] *Cousin*, 353 Ga. App. at 875; *see Franco v. Eagle*, 361 Ga. App. 506, 507 (1) (864 SE2d 675) (2021) (explaining that when a question of law is at issue in a child support-modification case, we review the trial court's decision *de novo*).

guidelines."[5] These guidelines broadly define gross income as "all income from any source, . . . whether earned or unearned[.]"[6] And with the goal of determining gross income in modification cases such as here, OCGA § 19-6-15 (f) (4) (B), in relevant part, provides:

> When cases with established orders are reviewed for modification and *a parent fails to produce reliable evidence of income, such as tax returns for prior years, check stubs, or other information for determining current ability to pay child support or ability to pay child support in prior years, and the court or the jury has no other reliable evidence of such parent's income or income potential*, the court or the jury may impute income as set forth in subparagraph (A) of this paragraph, or may increase the child support of the parent failing or refusing to produce evidence of income by an increment of at least 10 percent per year of such parent's gross income for each year since the final order was entered or last modified and shall calculate the basic child support obligation using the increased amount as such parent's gross income.[7]

---

[5] *Cousin*, 353 Ga. App. at 880 (3) (a) (i) (punctuation omitted); *accord Franco*, 361 Ga. App. at 507 (1) (a); *see* OCGA § 19-6-15 (b) (1) ("Pursuant to this Code section, the determination of monthly child support shall be calculated as follows . . . . Determine the monthly gross income of both the custodial parent and the noncustodial parent pursuant to subsection (f) of this Code section . . . .").

[6] OCGA § 19-6-15 (f) (1) (A).

[7] (Emphasis supplied).

But particularly noteworthy, the Supreme Court of Georgia has held that the text of this statute creates "two conditions precedent to the applicability of the provision: (1) a parent's failure to produce 'reliable evidence of income' and (2) the absence of any other 'reliable' evidence of such parent's income or income potential."[8] And it is only "*[i]f these two conditions precedent are met*, the text provides, the trier of fact 'may' resort to the remedy" prescribed in the statute to increase a parent's support obligation.[9] Our Supreme Court further explained that "[t]he clear [codified] intent of the subsection is to provide for a proxy—which is also in the nature of a

---

[8] *Jackson v. Sanders*, 299 Ga. 332, 334 (788 SE2d 387) (2016); *see Franco*, 361 Ga. App. at 508-09 (1) (a) (noting "our Supreme Court has explained that there are two 'conditions precedent to' imputing income under OCGA § 19-6-15 (f) (4): '(1) a parent's failure to produce 'reliable evidence of income' and (2) the absence of any other 'reliable evidence of such parent's income or income potential'" (punctuation omitted)).

[9] *Jackson*, 299 Ga. at 335. Prior to 2018, that remedy was solely the 10 percent (at the least) increase to the parent's previous gross income at issue in *Jackson*; but in 2018, the General Assembly added the current "may impute income as set forth in subparagraph (A) of this paragraph, or may" language, thus providing a trial court with a second means of increasing a parent's support obligation. But also notably, the two conditions precedent in the text were unchanged. *See* Ga. L. 2018, p. 937, § 1-2 (effective July 1, 2018).

penalty—for situations in which the parent's failure to cooperate impedes the court's ability to determine how appropriately to modify child support."[10]

Here, the trial court's final order does not show that Gibson failed to produce reliable evidence of his gross income or that no other reliable evidence of his current income existed—which OCGA § 19-6-15 (f) (4) (B) requires before the statute's imputation provision becomes applicable. In fact, the trial court's order acknowledges that Gibson provided evidence of his gross income for the last four years and that he was attempting to obtain permanent employment since being laid off but was thus far unsuccessful. And while the trial court expressed frustration with the reasons Gibson gave for failing to visit his sons more often, nothing in the order or hearing transcript indicates it questioned Gibson's credibility as to his past income or earnings from the temporary contract work in which he had engaged while seeking permanent employment. Yet, despite the lack of any determination that the two conditions precedent in OCGA § 19-6-15 (f) (4) (B) had been satisfied (or *any* mention of the statute for that matter), the trial court imputed Gibson's income (and ultimately his support obligation) by analyzing his earning capacity. In doing so, the trial court

---

[10] *Jackson*, 299 Ga. at 336.

erred.[11] Neither the trial court nor this Court is at liberty to disregard either the text of OCGA § 19-6-15 (f) (4) (B) or the Supreme Court of Georgia's explicit construction of it.[12]

---

[11] *See id.* (holding "that the trier of fact may utilize OCGA § 19-6-15 (f) (4) (B) where it determines that (1) the parent has failed to produce, and (2) there is not otherwise available, credible evidence establishing a significant portion of the parent's total gross income as defined in the statute. *If the trier of fact determines that these conditions precedent have been satisfied*, it will have the discretion to utilize the prescribed increment in determining the modified child support amount." (emphasis supplied)). *Cf. Berg v. Beaver*, 364 Ga. App. 350, 352-53 (1) (874 SE2d 868) (2022) (explaining that father's submission of tax returns, bank statements, and other income and expense statements did not preclude trial court from imputing his income when establishing child-support obligation, given that father was unable to explain discrepancies in financial documents, could not explain why certain income was included on some documents but not on others or why deposits into his bank account far exceeded his reported income); *Franco*, 361 Ga. App. at 509-10 (1) (a) (holding that trial court could impute father's income pursuant to OCGA § 19-6-15 (f) (4) (B) based on finding evidence of income submitted by father was not credible).

[12] *See Ward v. Marriott Int'l, Inc.*, 352 Ga. App. 488, 493 (2) (a) (835 SE2d 322) (2019) ("[A]s an intermediate appellate court, we are bound by Georgia statutes and Supreme Court of Georgia decisions. When the Supreme Court has addressed an issue in clear terms, this [C]ourt is not at liberty to decline to follow the established rule of law." (punctuation omitted)); GA. CONST. Art. VI, § VI, Para. VI ("The decisions of the Supreme Court shall bind all other courts as precedents."); *see also West v. City of Albany*, 300 Ga. 743, 745 (797 SE2d 809) (2017) (explaining "courts should construe a statute to give sensible and intelligent effect to all of its provisions and should refrain, whenever possible, from construing the statute in a way that renders any part of it meaningless" (punctuation omitted)).

Moreover, even if we could construe the trial court's final order as having determined that the two conditions in OCGA § 19-6-15 (f) (4) (B) were satisfied, the court erred in how it calculated that imputed income. As our Supreme Court has held, "[i]n certain circumstances, earning capacity rather than gross income may be used to determine child support, and while a party's past income is some evidence of earning capacity, it alone is not conclusive, but must be considered along with other relevant circumstances."[13] Toward that end, in addition to mirroring the language of subparagraph (B) concerning reliable evidence of income, OCGA § 19-6-15 (f) (4) (A) identifies factors that should be considered in imputing income, providing in relevant part that

> the court or the jury shall take into account the specific circumstances of the parent to the extent known, including such factors as the parent's assets, residence, employment and earnings history, job skills, educational attainment, literacy, age, health, criminal record and other employment barriers, and record of seeking work, as well as the local job market, the availability of employers willing to hire the parent, the prevailing earnings level in the local community, and other relevant background factors in the case.

---

[13] *Herrin v. Herrin*, 287 Ga. 427, 428 (696 SE2d 626) (2010) (punctuation omitted); *accord Duncan v. Duncan*, 262 Ga. 872, 873 (1) (426 SE2d 857) (1993).

But significantly, in order to sustain an award of child support premised on earning capacity, there "must be evidence that the parent *then has the ability to earn an amount sufficient to pay the award of support*; otherwise, the award cannot stand."[14]

Here, the trial court imputed an annual income to Gibson—$681,820—that is three times what he made in his most recent year of full-time employment by excluding his highest and lowest earning years and then averaging the two middle earning years for two of the five previous years. But inexplicably, the court overlooked Gibson's most recent W-2, which would seem to be the most predictive of his future earning capacity, or the earnings from the temporary contract work in which he engaged while seeking permanent employment. Additionally, the trial court ignored Gibson's unrefuted testimony that two of those years reflected anomalous earnings due to the pandemic—an event not likely to be repeated (at least not with any degree of certainty), and so not a reliable basis for predicting his future earning capacity. So, although the trial court was well within its discretion to consider Gibson's assets in imputing his income, the court seemingly ignored Gibson's similarly unrefuted testimony that—given his current unemployment—he was steadily depleting some

---

[14] *Herrin*, 287 Ga. at 428-29 (punctuation omitted) (emphasis supplied).

of these assets to pay his current expenses, including his child-support obligations. And finally, the trial court's order assumed Gibson could find employment comparable to his prior employment relatively quickly, even though the evidence showed he had been trying for several months—applying for more than 200 positions—without success. Given these particular circumstances, the trial court abused its discretion by cherry-picking the evidence on which it relied to calculate Gibson's earning capacity. Indeed, absent evidence of Gibson's *present ability* to earn $681,820 and ability to pay $9,764 monthly in child support, this "portion of the award cannot stand."[15] Accordingly, we vacate the trial court's final order of child-support modification and remand the case for the court to engage in a determination of Gibson's income under OCGA § 19-6-15 (f) (4) (B) and entry of an award that is supported by the evidence.

---

[15] *Lockhart v. Lockhart*, 361 Ga. App. 499, 502 (1) (a) (863 SE2d 174) (2021); *see Duncan*, 262 Ga. at 874 (2) (reversing trial court's child-support award purportedly based on father's earning capacity rather than gross income because it was not supported by evidence); *Lockhart*, 361 Ga. App. at 501-02 (1) (a) (vacating trial court's child support award because the evidence presented at hearing was insufficient to support the court's determination of father's present ability to earn imputed income and given that there was no evidence the father otherwise had significant assets or suppressed his income).

2. Gibson also maintains the trial court erred by including extraordinary educational expenses despite the lack of any supporting evidence; adding non-work-related childcare expenses; and adding a high-income deviation based on imputed rather than adjusted income. Gibson further claims that—as to educational and work-related childcare expenses—the trial court failed support its calculations on the proper worksheets.

OCGA § 19-6-15 (h) (1) (A) provides:

Work related child care costs necessary for the parent's employment, education, or vocational training that are determined by the court to be appropriate, and that are appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together, shall be averaged for a monthly amount and entered on Child Support Schedule D--Additional Expenses under the column of the parent initially paying the expense.

In addition, OCGA § 19-6-15 (i) (2) (I) (i) (II) similarly provides: "If a deviation is allowed for extraordinary educational expenses, a monthly average of the extraordinary educational expenses shall be based on evidence of prior or anticipated expenses and entered on the Child Support Schedule E--Deviations." Importantly, the Supreme Court of Georgia has "explained that, when applicable, as it is here,

16

OCGA § 19-6-15 makes certain findings mandatory."[16] And in this matter, it appears Gibson is correct that the trial court did not enter its calculations for extraordinary educational expenses or those for work-related childcare on the appropriate worksheets as required by statute.[17] Nonetheless, regardless of whether the trial court erred in this regard, given our holding in Division 1 *supra*, vacating the trial court's calculation of Gibson's gross income, the basis for these additional calculations no longer exists.[18] Accordingly, we vacate those determinations as well.

3. Finally, Gibson argues the trial court erred by amending its order in a subsequent term of court to make the judgment temporary, rather than final, which required him to pay the new support award during the pendency of the appeal. Once again, we agree.

---

[16] *Johnson v. Ware*, 313 Ga. App. 774, 778 (3) (723 SE2d 18) (2012) (punctuation omitted); *accord Holloway v. Holloway*, 288 Ga. 147, 149 (1) (702 SE2d 132) (2010).

[17] *See supra* OCGA § 19-6-15 (h) (1) (A); OCGA § 19-6-15 (i) (2) (I) (i) (II); note 16 & accompanying text.

[18] *See supra* note 5 & accompanying text.

It is well established that "[o]rdinarily, a trial court's power to amend or modify its judgment ends with the term in which judgment was entered."[19] But under OCGA § 9-11-60 (g), "[c]lerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders." Specifically, clerical errors or omissions include "irregularities that are apparent from the face of the record or mathematical errors that are obvious from the judgment."[20] Nevertheless, OCGA § 9-11-60 (g) does not "provide authority for making substantive changes to an order."[21]

---

[19] *Ekhorutomwen v. Jamison*, 356 Ga. App. 807, 808 (849 SE2d 235) (2020); *see Tremble v. Tremble*, 288 Ga. 666, 668 (1) (706 SE2d 453) (2011) ("A judge's power to revise, correct, revoke, modify, or vacate a judgment does not extend beyond the same term of court, unless a motion to modify or vacate, et cetera, was filed within the same term of court." (punctuation omitted)).

[20] *Ekhorutomwen*, 356 Ga. App. at 808 (punctuation omitted).

[21] *Id.* at 809; *see Porter-Martin v. Martin*, 280 Ga. 150, 151 (625 SE2d 743) (2006) (holding that OCGA § 9-11-60 (g) does not apply to substantive matters).

In this matter, the trial court's final child-support order was entered on April 15, 2024, and the amended order, incorporating the consent parenting plan, was entered on April 19, 2024, both during DeKalb County's March term of court.[22] The second amended order, providing that the support award would be temporary and granted at Fowler's behest, was entered on May 20, 2024, in the May term of court, after the court learned that Gibson intended to seek an appeal. But this change to the order, stating "this final order shall also act as a temporary order, which shall bind the parties pending appeal of the final judgment[,]" did not in any way simply correct a clerical error. To the contrary, beyond the term of court in which the initial order was issued, the trial court's amendment *substantively* changed the obligations of the parties—particularly Gibson's—pending any appeal.[23] As a result, the trial court erred in modifying the April 19, 2024 order, providing that the child-support modification

---

[22] *See* OCGA § 15-6-3 (37) (terms of court in DeKalb County begin the first Monday in January, March, May, July, September, and November).

[23] *See supra* note 2 & accompanying text.

19

order would be temporary, under the guise of correcting a clerical error.[24] Thus, we also vacate the trial court's second amended modification order.

*Judgment vacated and case remanded with direction. Mercier, C.J., and Land, J., concur.*

---

[24] *See Porter-Martin*, 280 Ga. at 151 (holding trial court lacked authority to grant husband's motion to correct divorce decree beyond term of court by revising conclusive finding of fact in divorce decree as to amount of husband's income as such was not a clerical error under OCGA § 9-11-60 (g)); *Ekhorutomwen*, 356 Ga. App. at 809 (explaining trial court's award of $160 per month in child support was not mere clerical error that court could correct after expiration of term in which judgment was filed); *Ivery v. Brown*, 307 Ga. App. 732, 734 (706 SE2d 120) (2011) ("Changing the order in a subsequent term of court from dismissal with prejudice to dismissal without prejudice is not a clerical error appearing on the face of the record, but a substantive change that was not authorized under our law").